TRANSCRIBED FROM DIGITAL RECORDING

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:17-cr-0064-KJD-GWF
4              Plaintiff,           )
                                    ) Las Vegas, Nevada
5    vs.                            ) March 20, 2018
                                    ) Courtroom 4A
6    JACK WILLIAM MORGAN,           )
                                    )
7                                   ) Recording method:
               Defendant.          ) Liberty
8    _____)    9:41 a.m. - 9:44 a.m.
                                     9:50 a.m. - 10:27 a.m.
9                                    SENTENCING AND DISPOSITION

10                    *CERTIFIED COPY*

11              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE KENT J. DAWSON
12         UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   For the Government:    *SUSAN CUSHMAN, AUSA*
                            United States Attorney's Office
15
     For the Defendant:     *JACK WILLIAM MORGAN, Pro Se*
16                 -AND-
                            *DUSTIN MARCELLO, ESQ., Advisory Counsel*
17                          Pitaro & Fumo, Chtd.

18   Also Present:          *BRIAN BLEVINS*
                            U.S. Probation Office
19

20   Recorded by:          Alana Kamaka

21   Transcribed by:        Amber M. McClane, CCR 914
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada 89101
23                          AM@nvd.uscourts.gov

24   Proceedings recorded by electronic sound recording.
     Transcript produced by mechanical stenography and computer.
25

TRANSCRIBED FROM DIGITAL RECORDING

```
 1        LAS VEGAS, NEVADA; TUESDAY, MARCH 20, 2018; 9:41 A.M.

 2                            --o0o---

 3                      P R O C E E D I N G S

 4          MR. MARCELLO:  Court's indulgence, Your Honor.  I

 5   apologize.

 6          THE COURT:  Yes.

 7          MR. MARCELLO:  Mr. Morgan seems to -- a little bit

 8   out of it.  I know he's had some health issues and had some

 9   issues at the jail.

10          THE COURT:  Okay.

11          MR. MARCELLO:  I was just asking him if he's -- how

12   he feels about going forward today.  He does have some things

13   that he wants to say, but I -- I would feel that he does --

14   he's not focused on what -- what today's hearing would be for

15   today based --

16          THE COURT:  He's not what?

17          THE DEFENDANT:  If I may interject, I would like to

18   go forward, quickly as possible.

19          THE COURT:  Okay.  All right.

20          MR. MARCELLO:  Well, okay.

21          COURTROOM ADMINISTRATOR:  This is the time set for

22   sentencing, *United States of America versus Jack William

23   Morgan*, Case No. 2:17-cr-0064-KJD-GWF.

24          Counsel, please note your appearance for the record.

25          MR. MARCELLO:  Dustin Marcello, standby counsel.
```

TRANSCRIBED FROM DIGITAL RECORDING

1    Mr. Jack Morgan is present in custody.

2              **THE COURT:**  Thank you.

3              **THE DEFENDANT:**  Jack Morgan.

4              **THE COURT:**  Thank you.

5         **MS. CUSHMAN:**  Good morning, Your Honor.

6    Susan Cushman for the United States.  With me at counsel --

7    counsel table is the Assistant U.S. Attorney Kate Newman, and

8    FBI Special Agent Brian Wainscott.

9              **THE COURT:**  Thank you.

10        Okay.  This is the time set for imposition of

11   sentence.  Following a jury trial, the defendant was found

12   guilty of conspiracy to commit kidnapping and kidnapping.

13   Having been found guilty pursuant to a jury verdict, the Court

14   adjudicates you guilty of those charges.

15        No objections have been filed to the presentence

16   report; however, the Government has filed a sentencing

17   memorandum in which they recommend an upward departure based

18   on exceptional circumstances, which I will go through in a

19   moment.

20        Mr. Morgan, did you have an opportunity to read the

21   Presentence Investigation Report prepared in your case?

22             **THE DEFENDANT:**  Yes.

23             **THE COURT:**  Did you have an opportunity to discuss it

24   with standby counsel?

25             **THE DEFENDANT:**  No.

TRANSCRIBED FROM DIGITAL RECORDING

1           THE COURT:  Okay.  Did you want to discuss it with

2    standby counsel?

3           THE DEFENDANT:  We're doing that now.

4           THE COURT:  Okay.  Do you need a few minutes to do

5    that?

6           THE DEFENDANT:  Not really.

7           THE COURT:  Okay.  Have you --

8           MR. MARCELLO:  And I apologize, Your Honor.  I did

9    attempt to visit him twice.  Both times he was not medically

10   cleared for visits due to issues that -- health issues at the

11   jail.

12          THE COURT:  Okay.

13          MR. MARCELLO:  What I'm discussing with him is he

14   wasn't familiar with the idea of objections to the Presentence

15   Investigation Report.  So he's asking me questions about that.

16          THE COURT:  Okay.  Well, I'm going to give you an

17   opportunity to go over the report with him and -- and

18   determine whether he has any objections to the factual

19   accuracy of the report, and to the best of his ability,

20   whether he has any objections to the probation officer's

21   application of the advisory guidelines.

22          MR. MARCELLO:  Understood, Your Honor.

23          THE COURT:  So what -- what do you think?  A

24   10-minute recess, is that enough, or do you need more time?

25          MR. MARCELLO:  That should be enough, Your Honor.

AMBER M. McCLANE, CCR 914
(702) 384-0429

TRANSCRIBED FROM DIGITAL RECORDING

1    **THE COURT:**  All right.  Well, take what time you

2  need, and then let me know when you're ready and we'll --

3  we'll resume.

4    **MR. MARCELLO:**  Okay.  Thank you, Your Honor.

5    **THE COURT:**  You're welcome.

6    *(Pause in the proceedings, 9:44 a.m. until 9:50 a.m.)*

7    **COURTROOM ADMINISTRATOR:**  All rise.

8    **THE COURT:**  Thank you.  Please be seated.

9    All right.  Mr. Marcello, did you have an opportunity

10  to go over the Presentence Investigation Report with

11  Mr. Morgan?

12    **MR. MARCELLO:**  To the extent he wished to go over it,

13  yes, Your Honor.

14    **THE COURT:**  Okay.  Mr. Morgan, has -- have you had

15  enough time to go over it with your advisory counsel?

16    **THE DEFENDANT:**  Yeah.

17    **THE COURT:**  All right.  Have you any objections to

18  the factual accuracy of the report?

19    **THE DEFENDANT:**  No.

20    **THE COURT:**  Do you have any objections to the

21  probation officer's application of the advisory guidelines?

22    **THE DEFENDANT:**  I don't know what that means.

23    **MR. MARCELLO:**  He -- he had indicated to me, Your

24  Honor, if I could, that he did object to any of the upward

25  departures that were listed --

TRANSCRIBED FROM DIGITAL RECORDING

1       **THE COURT:**  Okay.

2       **MR. MARCELLO:**  -- when I explained to him what those

3  were, as well as any opinion statements that were made such as

4  reference to this being a heinous crime or making any value

5  judgments about the actions or about the offense itself.  So

6  those are --

7       **THE COURT:**  Okay.

8       **MR. MARCELLO:**  -- two things he'd indicated to me

9  when we discussed it.

10      **THE COURT:**  Okay.  All right.

11      **THE DEFENDANT:**  That's correct.

12      **THE COURT:**  We'll go over those enhancement

13  recommendations in a moment.  And what I can do is --

14      **MR. MARCELLO:**  Although, I will say he didn't have a

15  per se objection to the calculations that were originally

16  provided; just to the upward departures.

17      **THE COURT:**  Okay.  Thank you.

18      Is that correct, Mr. Morgan?

19      **THE DEFENDANT:**  Again I don't know what that means.

20      **THE COURT:**  Well, the sentencing guidelines contain

21  base offense levels for various kinds of crime, and the

22  Probation Department has calculated a base offense level of

23  the two counts of conviction at 35.

24      **THE DEFENDANT:**  In that -- in that regard, any

25  punishment for -- for the -- the factual statements --

TRANSCRIBED FROM DIGITAL RECORDING

1    **THE COURT:**  Right.

2    **THE DEFENDANT:**  -- is a heinous crime.

3    **THE COURT:**  We'll go over that in a moment.

4    **THE DEFENDANT:**  So, yes, I guess that's an objection.

5    **THE COURT:**  All right.  So the base offense level is

6    35.  The defendant did not accept responsibility for the

7    offense.  He went to trial.  So the total offense level is 35.

8        The departure issues as presented by the Government

9    are physical injury, extreme psychological injury, weapons or

10   dangerous instruments, and extreme conduct for which the

11   Government is recommending two -- two levels upward for each

12   of those departures.

13       So I will hear from Ms. Cushman on your

14   recommendations for departure.  Then I'll hear from

15   Mr. Morgan.

16   **MS. CUSHMAN:**  Your Honor, the Government is

17   recommending a sentence of life imprisonment based on the

18   upward departure as listed in my sentencing memo.

19       Prior to trial, the defendant was advised that,

20   because he was charged with conspiracy to commit kidnapping,

21   the maximum term of imprisonment was life.  I think that it's

22   justified under all of the sections that we've listed, first

23   being physical injury.  I've discussed that at length in my

24   sentencing memo, but essentially the injuries that the victim

25   in this case sustained were certainly more than ordinary or

TRANSCRIBED FROM DIGITAL RECORDING

```
1    the kind of injuries you'd see in a minor scuffle.  She was,
2    you know, pulled from her apartment.  She was choked
3    unconscious.  She was dragged downstairs.  She was handcuffed
4    and chained and thrown in the back of a van.  She's got
5    permanent marks on her body as a result of this.  Her eyes --
6    the blood vessels in her eyes ruptured because he choked her
7    unconscious on six separate occasions.  These are physical
8    injuries that -- she's got a permanent scar around her ankle
9    from the handcuffs being so tight for 12 hours.  These are --
10   these are more than just minor injuries that you would sustain
11   during a minor scuffle, and certainly the case law in the
12   Ninth Circuit supports an upward variance based on physical
13   injury.
14          The same goes for the extreme physical injury.  This
15   is something --
16          THE COURT:  Psychological.
17          MS. CUSHMAN:  I'm sorry.  Psychological injury.
18   Thank you.
19          Psychological injury, it's the same thing.  She's in
20   her apartment sleeping.  This is every person's worst
21   nightmare.  Somebody comes from a place where you're supposed
22   to -- to your place where you're supposed to feel safe and
23   secure, and you're pulled out of your apartment.  You're,
24   again, choked unconscious, dragged downstairs, and thrown in
25   the back of a van where you ride for 12 hours not knowing
```

TRANSCRIBED FROM DIGITAL RECORDING

1    what's going to happen to you.  And as a result of this, she

2    stated in the presentence report that she has a lingering

3    sense of paranoia and fear.  She has difficulty focusing and

4    accomplishing tasks.  She has panic and anxiety whenever

5    somebody knocks at her door.  She sleeps with the lights on.

6    She wears her glasses all the time.  She testified at trial

7    that she had gone to a therapist to try to help her sort of

8    put this event behind her, but this is something she's going

9    to struggle with for the rest of her life.

10          With the weapons and dangerous instrumentalities,

11   again, there was testimony in the trial that the defendant and

12   the co-defendant went out and purchased a stun gun to use on

13   her to disable her, to be able to get her out of the

14   apartment.  Fortunately, the stun gun didn't work, and as a

15   result of it, a struggle ensued which caused the neighbor to

16   hear what was happening and actually look outside and see them

17   dragging her down the stairs.  There was also a rifle that was

18   recovered from the cave that the defendant had built to keep

19   her held captive in.  There was numerous rounds of ammunition

20   recovered from that cave.

21          So he was -- you know, had gone through a lot of

22   planning.  He had these weapons.  He was going to use them if

23   he needed to.  And he, in fact, tried to use one and it didn't

24   work.  And because it didn't work, we're actually here today.

25          Again, the Ninth Circuit case law upholds a variance,

TRANSCRIBED FROM DIGITAL RECORDING

1    or an upward departure, based on those facts.

2          The other area is extreme conduct.  This is a case

3    where he planned for approximately a year and six months to

4    kidnap her.  He dug a cave out of a remote hillside.  The cave

5    wasn't just one room; it was a series of rooms.  One of the

6    rooms actually had a bed in it.  He took the trouble to

7    install an eye bolt and a chain that he was going to use to

8    chain her up in so that she couldn't -- could never leave that

9    cave.  He brought supplies up to the -- up to the cave.  He

10   had food items there.  All this was evidence that was shown at

11   trial.  He -- he had a -- a cache of ammunition.  He had a gun

12   up there.  So he had supplied this.  And then he and the

13   co-defendant got Ms. -- got in their van and they drove to

14   Las Vegas.  And they didn't know where the victim lived, so he

15   used a ruse to invite her to a coffee shop so that he could --

16   when she left, he could follow her home, which is what they

17   did, and they located her apartment complex.  But they still

18   didn't know what apartment she lived in, so the co-defendant

19   went door to door in the apartment complex pretending to

20   solicit church donations to try to find out where she lived.

21   And when they finally found out where her apartment was,

22   that's when he tried to kidnap her -- or did kidnap her from

23   her apartment.

24          But this is -- this is not normal behavior.  I mean,

25   this is a lot of planning.  This is a lot of thought.  He

TRANSCRIBED FROM DIGITAL RECORDING

1    didn't turn on his cell phone the whole time so that -- so

2    that nobody could track him.  And, fortunately, for whatever

3    reason, when he got to Española, he decided to turn on his

4    cell phone, and the Española Police Department then were able

5    to locate them and stop them.  And he was a mere seven minutes

6    away from that cave.

7           Also, during the course of the trial and at closing,

8    he completely said he would do this again.  He made remarks

9    like, "I'll see you next time."  In his mind, throughout the

10   trial, everything he did was justified.  This is not normal

11   behavior.  She will never be safe unless he spends the rest of

12   his life in prison.

13          And so, for those reasons, I feel that an upward

14   variance in this case is completely warranted.

15          **THE COURT:**  Thank you.

16          Mr. Morgan, you have an opportunity to respond to the

17   Government's argument.

18          **THE DEFENDANT:**  Yes.

19          **THE COURT:**  Enhancement.

20          **THE DEFENDANT:**  Well, not normal; that's a good way

21   of putting it.  If the scripture tells us anything it's that

22   broad is the way that leads to destruction and narrow is the

23   way that leads to eternal life.  So may I never be normal.

24          What I have done has been to take somebody that I

25   love from a life that was dangerous and to correct them

TRANSCRIBED FROM DIGITAL RECORDING

1    because they had wandered far off the path from perhaps in

2    this city what was normal but we know leads to death.

3    Prostitution and adultery are sins that result in the eternal

4    death that we all seek to avoid, and I sought to bring her

5    back to the eternal life, to the love and the faithfulness

6    that we once shared.

7         Now, to say that -- excuse me -- I would take

8    somebody forever -- or I should say to correct somebody

9    forever from a course to which they had strayed is, well,

10   irrational.  A person can never be under correction or

11   discipline for a single matter forever, but only as long as it

12   takes them to correct to the path.  That's why -- well, I

13   should say that's why the justice system should have a

14   rehabilitative sense rather than a punitive sense.  Our

15   justice system has no such thing.

16        But true justice only corrects somebody as long as is

17   necessary until they learn the error of their ways, until they

18   come to what we call repentance, which is in -- not only an

19   inward awareness of what you have done wrong, but an outward

20   demonstration of actions that reflect that inner awareness.

21        We know that the things that Jane was engaged in are

22   wrong.  Adultery, lies, prostitution, these are all basic

23   stuff and, unfortunately, stuff that has become basic to this

24   city.  Well, we should all remember that that does not make it

25   right just because it is normal.  We should be conscientious,

TRANSCRIBED FROM DIGITAL RECORDING

1    resourcefully responsible people, be aware of the evil that

2    surrounds us, and act to inhibit it.  If any of us saw

3    somebody steal, we would point it out, we would say something,

4    we would do something.  If we saw somebody murder, the same

5    thing would happen.  Yet, why, when we see someone commit

6    adultery, when we see someone lie, when we see someone commit

7    prostitution, and then that person -- in this case, me, the

8    person who is socially responsible -- does something, then we

9    take it upon ourselves to punish that man for his just

10   actions.

11        The scripture says that when a man and a woman are

12   united in their flesh, then they become one flesh.  The very

13   concept that a man -- that I could kidnap Jane is as

14   impossible as if I could kidnap my own foot or my own hand.

15   She belongs to me, and I belong to her.  As it says, I am my

16   beloved's and my beloved is mine.  Jesus Christ himself said

17   that what God has joined, meaning the union of the flesh, let

18   no man separate and, yet, here I sit surrounded by men.  For

19   me, it's the Government who has separated what God has joined.

20        There is an ultimate judge, and he has no respect of

21   power.  The beggar and the king, the judge and the prisoner

22   are all the same before his eyes.  And he will not judge you

23   based on American law or on what is normal in a city that is

24   known for sin.  He will judge you based on his commandments,

25   and his commandments are eternal and true.  It says thy word

TRANSCRIBED FROM DIGITAL RECORDING

```
 1   is true from the beginning and thy righteous judgments endure
 2   forever.
 3        You look at the situation and you see all the
 4   superficial physical things and they see an extreme, but
 5   please consider that my situation was extreme.  I come home
 6   one day to find my wife, who I was living with, who I
 7   protected, who I loved, who I provided for -- any time
 8   something was wrong, I was there to comfort her.  If her car
 9   broke down, I was there to fix it.  This was someone who I
10   called my little girl and she called me her daddy, and in the
11   very real sense, that's what we were.  You would have to know
12   the loss of a child to understand the pain which you have
13   caused me, and that is not a pain that I can bear.
14        She used to sneak heart-shaped notes that said,
15   "Kitten loves Daddy," into my pocket when I wasn't looking.  I
16   have known her to be sweet and innocent and loyal and
17   faithful.  And I brought her to this city, and this city, with
18   its sin, corrupted her.  And then when I tried to take her
19   back from the sin which so easily beseeched us all.  I turn to
20   everyone listening that we are all easily beset by the evils
21   of this world because they are tempting, but we should ought
22   never, never forget that these sins destroy us from the inside
23   out.  And the suffering, the pain, the psychological damage
24   that you'll attribute to me is directly a result of the things
25   that I have seen her go through as a result of the sins that
```

TRANSCRIBED FROM DIGITAL RECORDING

1   have so easily beset her.

2          Where does the fear come from?  Does it come from me

3   trying to correct her?  I corrected her the whole time we were

4   together, for years.  And my corrections led to her

5   betterment.  This is no different.  My correction would have

6   led to her betterment.  But you prevented her from being

7   corrected, and now she is beset in her sins.  It says

8   whosoever leads one of my little ones astray, it is better for

9   him that a millstone was hanged around his neck and he were

10  cast into the middle of the sea.  You have taken my little

11  one, and you have led her astray.  God have mercy on your

12  souls.

13         True repentance begins with turning away from sin.

14  The only thing available to you to do now that is righteous is

15  to give me time served so that I may pray for repentance of

16  all the souls involved in this heinous crime.  And this, what

17  has been done to me and to my family, is a heinous crime.

18         And it has -- all (inaudible) made for me to bear, I

19  bear you no malice because the Lord avenges all evils.  I

20  merely pray that you will turn from this evil that you have

21  done so that you may avoid the consequences, the inevitable

22  consequences that that great judge on that final day will give

23  to all those who did evil against his children.  I pray for

24  your souls as a compassionate friend, not in (inaudible)

25  because I know that I, too, have sin.  And my sin is great,

TRANSCRIBED FROM DIGITAL RECORDING

1  this is true; I am not innocent.  I have committed many

2  grievous and terrible sins in my time, but I have repented of

3  them and I have received forgiveness and I urge you to do the

4  same.

5          But if you are unwilling to do the right thing

6  according to the word of God, then I am willing to meet my

7  adversary on the way, and I would like to request a commission

8  to the Peace Corps of 10, 20, 30 years, however long you feel

9  is appropriate.  I will offer also the military, but I cannot,

10  in good conscience, join an organization that kills unless I

11  were perhaps to be an unarmed medic.  That is all that the

12  Lord has put on my heart.  With a final quote from Martin

13  Luther:  My conscience is bound up in the word of God.  I

14  cannot and will not recant anything for it is against my

15  conscience, and it is neither safe nor right to go against

16  conscience.  May God help me.

17          I have said my piece.

18          **THE COURT:**  Mr. Marcello?

19          **MS. CUSHMAN:**  Your Honor, I'm sorry.  The victim's

20  father is here, and he'd like to speak, too, if the Court

21  would entertain that.

22          **THE COURT:**  I will.

23          **MR. MARCELLO:**  And just real quick, Your Honor.  As

24  standby counsel, Mr. Morgan is -- he didn't want me to make

25  any other statement, just to remind him about his request for

AMBER M. McCLANE, CCR 914
(702) 384-0429

TRANSCRIBED FROM DIGITAL RECORDING

```
 1    the Peace Corps and the military so --

 2              THE COURT:  Okay.  Thank you.

 3              MR. MARCELLO:  -- any further.

 4              THE COURT:  Thank you.  The podium.  There's a

 5    microphone right there on that -- no.  Right there in front of

 6    you.  That's a microphone.  Yes, sir.

 7              MR. PRIEBE:  Good morning.  My name is

 8    Anthony Priebe.

 9              THE COURT:  Yes, sir.

10              MR. PRIEBE:  And I'm -- I'm here to make a statement

11    for our daughter, Jane.

12              THE COURT:  You may do so.

13              MR. PRIEBE:  Thank you.

14              I'm here today to thank everybody for the effort

15    that's been put in in saving our daughter's life and

16    representing our daughter, and I'm asking that we be protected

17    from the man that kidnapped our daughter, had plans to

18    torture -- in my opinion kill -- our daughter, Jane.  And the

19    impact that it's had on our lives and the significant impact

20    that it's had on our daughter, Jane, means that it's essential

21    that we be protected from this man for the rest of our lives.

22    And what we ask and what we beg is that Jack Morgan be placed

23    in -- in imprisonment and confinement for the rest of his life

24    so that we can sleep at night, we can recover, and we can

25    heal.  And this is what we pray and this is what we ask from
```

1    the Court.

2              **THE COURT:**  Thank you, sir.

3              **MR. PRIEBE:**  Thank you.

4              **THE COURT:**  Okay.  Mr. Morgan, do you have anything

5    to add before sentence is imposed?

6              **THE DEFENDANT:**  Can I say something to Tony?

7              **THE COURT:**  Pardon?

8              **MR. MARCELLO:**  No.

9              **THE DEFENDANT:**  Ah.

10             **MR. MARCELLO:**  He was asking to speak to Mr. Tony.

11             **THE COURT:**  No.  That's -- that's not to be

12    permitted.

13             **THE DEFENDANT:**  Tony's mistaken.  That's all.

14             **THE COURT:**  I'm sorry?  I didn't hear you, sir.

15             **THE DEFENDANT:**  Tony is mistaken.  That's all.

16             **THE COURT:**  Okay.  Anything else?

17             **THE DEFENDANT:**  May the Lord bless and keep me.

18             Oh.  Wait, wait.  With the measure that you make, it

19    shall be measured to you again (inaudible).

20             **THE COURT:**  All right.  This case is obviously a very

21    serious case because of the facts of -- of the occurrences

22    that led to this defendant's conviction.  Mr. Morgan did cause

23    serious physical injury.  As indicated, he choked the victim

24    unconscious six separate occasions, admitted he did so,

25    dragged her downstairs to a -- a van.  As a result of being

1   choked, her blood vessels in her eyes ruptured.  She was

2   handcuffed, wrists and ankles, chained to the floorboard of

3   the van.  She has a permanent scar on her ankle.  She lost

4   feeling in her thumb for several months.  Those are some of

5   the physical injuries.

6           There has been an extreme psychological injury in

7   that the victim has a sense of paranoia that continues.  She

8   worries when people knock on her door.  She has a fear of

9   leaving her house.  She has panic attacks, and she has

10  difficulty focusing.  So the psychological injury is extreme.

11          The use of weapons and dangerous instrumentalities, I

12  do believe that a person who operates a stun gun without

13  experience can present a great risk to the life of another

14  individual.  Mr. Morgan had a rifle at the -- at the location

15  with lots of ammunition.  This was not just to the extent of

16  being explained away by hunting or some other innocuous

17  activity, but he obviously intended to keep her chained and to

18  defend what he was doing.  And he has reiterated his belief

19  that what he is doing was -- is -- was appropriate and that

20  everyone else was in error, including the Court and the law

21  enforcement authorities who have charged and convicted him.

22          This case involves extreme conduct in that the

23  defendant spent a year planning the kidnapping, extensive

24  preparation in locating her, and digging out a cave in the

25  side of a hill that was not visible from the road in Española,

TRANSCRIBED FROM DIGITAL RECORDING

1  New Mexico; the installation of eye bolts and chains tested by

2  the co-defendant to make sure that they would secure the

3  victim once the kidnapping occurred; and -- and, fortuitously,

4  he was discovered before he disappeared into the -- into that

5  cave with this defendant.  Notably, he had a -- a place on top

6  of the hill where he had a view and his freedom, but he was

7  treating the victim as a -- as a -- his piece of property,

8  which he has reiterated in his comments to the Court he viewed

9  this other person as being owned by him and not -- not able to

10  exercise her freedom to choose whether she was with him or

11  someone else.  And so this is a -- a case that involves

12  extreme conduct.

13          So Mr. Morgan has memorized many scriptures and he

14  has excerpted those that would suit his purpose and justify

15  his actions, but he has overlooked the -- the theme of the

16  scriptures, the *Bible* that he quotes.  From *Genesis* on through

17  to *Revelation*, the overwhelming message of -- of those

18  scriptures is that people have individual rights and the

19  freedom to choose good and evil without interference.  Just as

20  Adam and Eve were told not to partake of the fruit of the tree

21  of knowledge of good and evil, they were left with the choice

22  to do so.  God did not intervene by imprisoning Eve when she

23  partook of it.  They were free to each choose what they would

24  do and then suffer the consequences.  That is the message of

25  the *Bible*:  Freedom of choice.  God does not intervene.  And

TRANSCRIBED FROM DIGITAL RECORDING

1    so Mr. Morgan misses the entire intent of what the *Bible* is

2    all about.  Instead, he turns it into a tool to use as he sees

3    fit.  In this case, the scriptures have been his hammer to

4    coerce and imprison others and to justify his own desires

5    rather than taking into account the freedom of others to

6    choose what they will do and to suffer the consequences.

7          Unfortunately, Mr. Morgan has not given -- given me

8    any reason to -- to not impose a life sentence because he

9    is -- has -- to use his words, he is unrepentant.  He feels

10   that what he did was justified, and that this woman belongs to

11   him as his property in perpetuity.  And she's afraid, if he

12   gets out, that this will all be repeated.  And, in fact, he

13   made the remark or has made the remark that he would do it

14   again.  So what choice does the Court have but to depart

15   upward based on all of the facts and circumstances present

16   here?

17          A guideline sentence would not adequately take into

18   account the extreme circumstance of this case.  It would not

19   further the purpose of sentencing.  It would not protect the

20   public from further crime of the defendant.  He has proven his

21   willingness to use Samantha -- or Sam Brown to carry out his

22   desires.  So he's a very dangerous man.  And then, with his

23   present attitude, there is no safety.  And whether he'll ever

24   change his mind is -- since he feels justified is a question

25   this Court cannot speculate on at the -- at the risk that is

TRANSCRIBED FROM DIGITAL RECORDING

1  posed to the public if he gets out and is of the same frame of

2  mind that he is now.

3          I conclude that there should be an upward departure

4  based on physical injury, extreme psychological injury,

5  weapons that are dangerous instruments, and extreme conduct of

6  eight levels which would take it to a level 43, which is life.

7  The fine range at that level is $50,000 to $250,000.  The

8  maximum statutory term has always been life.  The maximum

9  statutory fine, $250,000.  The special assessment of $200 is

10  mandatory.  The criminal history category is one and, as

11  stated, with an offense level of 43, the guideline range is

12  life.

13          Now, the sentence is life as to each count to run

14  concurrent?

15              **PROBATION OFFICER:**  Yes, Your Honor.

16              **THE COURT:**  The 200-dollar penalty assessment is

17  imposed and due immediately.  Due to the defendant's financial

18  situation, the fine is waived.  The Court finds that the

19  sentence imposed is sufficient but not greater than necessary

20  to reflect the seriousness of the offense, it will promote

21  respect for the law, provide just punishment, and most

22  importantly, protect the public from further crimes of the

23  defendant.

24          Supervised release, should that become applicable, is

25  five years per count, concurrent.  While on supervised

TRANSCRIBED FROM DIGITAL RECORDING

1   release, the defendant will comply with the standard

2   conditions as recommended by the Sentencing Commission.  The

3   following mandatory conditions are required by statute.  You

4   should not -- you must not commit another federal, state, or

5   local crime.  You must not unlawfully possess a controlled

6   substance.  You must refrain from any unlawful use of a

7   controlled substance, submit to one drug test within 15 days

8   of release, and at least two periodic drug tests thereafter,

9   not to exceed 104 drug tests annually.  Must make restitution

10  in accordance with 18 USC Sections 3663 and 3663A.  The amount

11  of restitution is a total of $3,257.09.  The restitution list

12  will be attached to and become part of the judgment of

13  conviction --

14          **MS. CUSHMAN:**  And, Your Honor, I'd request that the

15  list be sealed, the restitution list.

16          **THE COURT:**  -- in this case.

17          The restitution list will be sealed because it does

18  contain addresses for payment.  The restitution will be paid

19  to the Clerk of the Court.

20          The -- you must cooperate in the collection of DNA as

21  directed by the probation officer.

22          The following special conditions are imposed.  You

23  must participate in a mental health treatment program and

24  follow the rules and regulations of the program.  The

25  probation officer will supervise your participation.  You must

TRANSCRIBED FROM DIGITAL RECORDING

1    pay the cost based on your ability to pay.

2         No contact condition.  You must not communicate or

3    otherwise interact with the victim, JP, or the co-defendant,

4    Samuel Sophia [sic] Brown, either directly or through someone

5    else without first obtaining the permission of the probation

6    officer.

7         Search and seizure.  You must submit your person,

8    property, house, residence, vehicle, papers, and computers or

9    other electronic communications or data storage devices to a

10   search conducted by the probation officer.  Failure to submit

11   to search may be grounds for revocation.  You must warn other

12   occupants that the premises may be subject to searches

13   pursuant to this condition.  The probation officer may conduct

14   a search under this condition only when reasonable suspicion

15   exists that you have violated a condition of supervision, that

16   the areas to be searched contain evidence of the violation.

17   Any search must be conducted at a reasonable time and in a

18   reasonable manner.

19        You do have the right to appeal.  If you wish to

20   exercise any right of appeal, you have 14 days from this date

21   in which to file the notice of appeal.  If you cannot afford

22   an attorney to represent you on appeal, one will be appointed

23   to represent you at the expense of the Government.  Likewise,

24   the transcript of the record will be prepared for use on

25   appeal also at the expense of the Government.

TRANSCRIBED FROM DIGITAL RECORDING

1          The record will reflect the probation officer's

2     handing the defendant a copy of the conditions of the

3     supervision of the District of Nevada, English language

4     version.

5          Is there a request for a designation, Mr. Marcello?

6          **MR. MARCELLO:**  Court's indulgence just one moment.

7          *(Conferring with counsel.)*

8          **MR. MARCELLO:**  He would request anywhere near

9     Pensacola, Florida.  He does have some family members down

10    there.

11         **THE COURT:**  The Court recommends as close to

12    Pensacola, Florida, as possible.

13         **MS. CUSHMAN:**  One more request, Your Honor.  I'd just

14    request that the restitution be joint and several with the

15    co-defendant, Samuel Brown.

16         **THE COURT:**  The -- that will be the order --

17         **MS. CUSHMAN:**  Thank you.

18         **THE COURT:**  -- joint and several.

19         And we are adjourned.  Thank you.

20         *(Proceedings concluded at 10:27 a.m.)*

21                          * * *

22         I, AMBER M. McCLANE, court-appointed transcriber, certify

23    that the foregoing is a correct transcript transcribed from

24    the official electronic sound recording of the proceedings in

25    the above-entitled matter.

TRANSCRIBED FROM DIGITAL RECORDING

1

2     /s/ _Amber M. McClane_                    5/16/2018
3          Amber M. McClane, CCR 914            Date

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25