1
2
3
4                       UNITED STATES DISTRICT COURT
5                            DISTRICT OF NEVADA
6                                    * * *
7    UNITED STATES OF AMERICA,                 Case No. 2:17-cr-0064-KJD-GWF
8                               Plaintiff,      ORDER DENYING DEFENDANT'S
                                                MOTIONS FOR COMPASSIONATE
9          v.                                   RELEASE (ECF Nos. 147/167)
10   JACK WILLIAM MORGAN,
11                              Defendant.
12
13          Presently before the Court are Defendant's Motions for Compassionate Release Pursuant
14   to 18 U.S.C. § 3582(c).  (ECF Nos. 147/167). The Government filed responses in opposition
15   (ECF Nos. 150/171) to which Defendant replied (ECF Nos. 161).[1]
16   **I.  Background**
17          On February 22, 2017, a federal grand jury in Las Vegas, Nevada, returned an indictment
18   charging Morgan and a co-defendant with conspiracy to commit kidnapping in violation of 18
19   U.S.C. § 1201(c), and kidnapping in violation of 18 U.S.C. § 1201(a)(1). Morgan's trial began
20   on December 18, 2017. The next day, a jury convicted him of both crimes charged in the
21   indictment. On March 20, 2018, the district court sentenced Morgan to life imprisonment.
22          **A.       Trial Evidence**
23          The evidence showed that Morgan arrived unannounced at the victim's apartment with a
24   stun gun, handcuffs, and duct tape. When the victim, who had ended her relationship with
25   Morgan about a year and a half earlier, expressed reluctance to go with Morgan to Texas, he
26   "pulled out a Taser," which he attempted to use on the victim, but "it didn't go off." Undeterred,
27
28   _____
     [1] The office of the Federal Public Defender advised the Court that it was declining to file any
     supplement to Morgan's motions. (ECF Nos. 148/1710).

1  Morgan proceeded to choke the victim "unconscious while dragging [her] back into [her]
2  apartment." Morgan choked the victim unconscious multiple times.

3       The victim "fought for everything that [she] was worth" while Morgan wrapped her face
4  with duct tape and used handcuffs to cuff her hands behind her back and to cuff her ankles.
5  While this was taking place, the victim "kicked," "tried to scream," "flailed," and "tried to beg
6  him." The victim was able to remove some duct tape from her face, but Morgan then "wrapped
7  more duct tape around [her] face." After about a 20-minute struggle, Morgan dragged the victim
8  from her apartment. In the process, the victim lunged for the fire alarm and kicked her neighbor's
9  door. She locked her arms onto the stair railing before Morgan choked her into unconsciousness
10 again. The victim's neighbor heard the commotion and when he opened his front door saw that
11 his "neighbor was being kidnapped." He noticed that "she was handcuffed" and that "her face
12 was turning purple" from being choked. The neighbor watched as the assailant "threw her in the
13 back" of a white van with a Texas license plate and then drove away from the apartment
14 complex. He then called 911 and met with police when they arrived.

15      The victim regained consciousness inside the van, where she saw Morgan's accomplice,
16 Samuel Brown. Morgan and Brown restrained the victim with a chain around her neck that was
17 connected to handcuffs on her wrists and feet. The chain was secured to "the bare metal of the
18 interior of the van," which prevented her from "mov[ing] at all." The restraints were extremely
19 tight and "hurt the entire time." At one point, Brown used rubbing alcohol to remove duct tape
20 from the victim's hair, although Morgan told the victim that he would have preferred "to cut it
21 out" because "he was going to shave [her] head anyway." Morgan told the victim he was taking
22 her to a cave, where she would be "chained to some kind of an anchor." Morgan had prepared
23 the cave to hold the victim "[o]n the top of a mountain in the middle of nowhere" in New
24 Mexico using a pickax and shovels. Morgan also told the victim that "[she] belonged to him and
25 he owned [her]" and that he had been preparing her abduction for a year and a half. About 12
26 hours later, New Mexico State Police spotted Morgan's van as it approached the town of
27 Espanola. New Mexico law enforcement had been on the lookout for a white minivan with Texas
28 license plates after receiving information about the kidnapping incident.

After they removed Morgan and Brown from the van, officers "could hear audible screams coming from inside the van." Officers opened a sliding door on the van and saw the victim restrained inside. They observed "chains [that] went from her neck down to her – to her wrists," which were in handcuffs, "[a]nd then, from the handcuffs, there was also a chain leading down into the – the van as it was bolted in[.]" The victim was "very, very distraught . . . she was crying and screaming for help." When police stopped Morgan's van it was "approximately a 10-minute drive" to the cave where he planned to imprison his victim. The cave was not visible from the roadway and required a "pretty steep hike over a very rocky terrain to climb up to it." Morgan had excavated "two separate rooms," one of which was still being enlarged. One room "had a bed carved out of stone" with a hole in the floor that "you could actually set a 4-gallon pail into it." The room also had "a metal chain that was attached with an anchor in the floor." Police found a .308 caliber rifle, "a lot of ammunition," and loaded magazines in the cave.

As a result of Morgan "beating the shit out of [her]," the victim suffered a number of physical injuries, including a black eye, lacerations inside her lip, burst blood vessels from being choked unconscious, bruises, and marks from the handcuffs around her wrists and legs. For several days after her release, the victim had "blood come out of [her] nose and [her] mouth," prompting her to seek treatment by an ear, nose, and throat specialist.

**B.    Procedural History**

The Court initially appointed the Federal Public Defender to represent Morgan. At his April 18, 2017, calendar call, Morgan asked the court to allow him to represent himself. The court told Morgan it was unwise for him to represent himself and "strongly urge[d]" him not to do so. Morgan was unpersuaded and after the Court canvassed him as required by <u>Faretta v. California,</u> 422 U.S. 806 (1975), it found that he had knowingly and voluntarily waived the right to counsel.

The Court conducted another *Faretta* hearing with Morgan at a later calendar call on December 12, 2017. Once again, the Court told Morgan that "a trained lawyer would defend [him] far better than [he] could defend [him]self" and that it was "unwise for [him] to try and represent [him]self." Morgan stood by his decision to forego representation, and the Court re-

affirmed that Morgan had "knowingly and voluntarily waived his right to counsel." On December 19, 2017, after a two-day trial, a jury convicted Morgan as charged in the indictment.

At sentencing, the Court calculated a base offense level of 35. The Court applied an eight-level upward departure to account for physical injury (U.S.S.G. § 5K2.2), extreme psychological injury (U.S.S.G. § 5K2.3), the use of weapons or dangerous instruments (U.S.S.G. § 5K2.6), and extreme conduct by the defendant (U.S.S.G. § 5K2.8). The guideline sentence at offense level 43 was life imprisonment. See U.S.S.G. Ch. 5, Part A, Sentencing Table.

Defendant failed to object to any of these enhancements, causing stand-by counsel to intervene and argue on his behalf. The Court found that a sentence within the applicable guideline range without an upward departure "would not adequately take into account the extreme circumstance of this case." The Court further found that Morgan was "a very dangerous man" and that it could not speculate on "the risk that is posed to the public if he gets out and is of the same frame of mind that he is now." Consequently, the Court imposed a sentence of life imprisonment with five years of supervised release.

Stand-by counsel then filed an appeal and represented Defendant on appeal. On appeal, Defendant argued that:

> (1) Court should have inquired into the competency of the Defendant to present his own defense;
>
> (2) a *Faretta* canvas should have been conducted at sentencing or the Court should have imposed counsel on defendant at sentencing;.
>
> (3) Defendant was denied his right to present a complete defense;
>
> (4) Defendant was denied his speedy trial rights; and
>
> (5) Defendant's sentence was improperly enhanced.

The Ninth Circuit Court of Appeals affirmed the judgment of this Court, denying Defendant's appeal on each ground. See Memorandum, No. 18-10106, May 15, 2019, Doc. No. 132. Mandate, Doc. No. 135, issued on February 6, 2020. The Court denied Defendant's motion pursuant to 28 U.S.C. § 2255 on October 20, 2020. (ECF No. 139). Defendant failed to file a timely appeal and his appeal was dismissed by the Ninth Circuit Court of Appeals. (ECF No.

- 4 -

157).

Defendant has now filed two (2) motions for compassionate release. Since the arguments are virtually identical, the Court will consider the motions together.

**II.     Legal Standard**

Under 18 U.S.C. § 3582(c)(1)(A), a court may, in certain circumstances, grant a defendant's motion to modify his or her term of imprisonment. Before filing such a motion, the defendant must first petition the Bureau of Prisons ("BOP") for compassionate release. Id. A court may grant the defendant's motion for a modification in sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf" or after 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id.

If the exhaustion requirement is met, a court may modify or reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C.] section 3553(a)" if the Court finds, as relevant here, that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Id. As the movant, the defendant bears the burden to establish that he is eligible for compassionate release. See United States v. Wright, 46 F.4th 938, 951 (9th Cir. 2022) (explaining that it is the defendant's burden to establish his eligibility for compassionate release).

The Sentencing Commission has recently issued guidelines regarding when "extraordinary and compelling reasons" exist for compassionate release. U.S.S.G. § 1B1.13(b). The Guidelines note several relevant circumstances, including (1) the medical circumstances of the defendant; (2) the advanced age of the defendant resulting in "a serious deterioration in physical or mental health;" (3) "[t]he death or incapacitation of the caregiver of the defendant's minor child;" (4) whether the defendant, while in custody, was the victim of sexual or physical abuse; and (5) "other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described above warrant compassionate release." Id.

**III.    Analysis**

The Government does not dispute that Defendant has exhausted his administrative remedies. Accordingly, the Court turns to whether Defendant has shown extraordinary and compelling reasons warranting compassionate release. Defendant argues compassionate release is warranted for four reasons: (1) he contracted Covid-19 at his Bureau of Prisons ("BOP") facility and is at risk for re-infection; (2) he is actually innocent and his necessity defense was kept from the jury ; (3) he received an unusually long sentence for a non-homicide crime; and (4) he is the only person left to care for his victim.[2] The Court will consider the sentencing factors set forth in § 3553(a) first, and then turn to Defendant's arguments.

**A.    18 U.S.C. § 3553(a) Sentencing Factors**

When considering compassionate release, the Court must consider the sentencing factors set forth in § 3553(a). See 18 U.S.C. § 3582(c)(1)(A). Those factors include, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. See Rosales-Mireles v. United States, 138 S.Ct. 1897, 1903 (2018) ("District courts must determine in each case what constitutes a sentence that is sufficient, but not greater than necessary . . . to achieve the overarching sentencing purposes of retribution, deterrence, incapacitation, and rehabilitation").

The § 3553(a) factors do not favor Morgan's request. When it imposed sentence, the Court detailed Morgan's extreme conduct, which involved:

> a year planning the kidnapping, extensive preparation in locating [the victim], and digging out a cave in the side of a hill that was not visible from the road in Espanola, New Mexico; the installation of eye bolts and chains tested by the co-defendant to make sure that they would secure the victim once the kidnapping occurred; and—and, fortuitously, he was discovered before he disappeared

---

[2] Defendant's argument that he is the only person left to care for the victim is of such little substance the Court need not address it. At the minimum, Defendant relies solely on his self-serving statements and has not met his burden in demonstrating the truth of any of his factual allegations.

> into the—into that cave with this defendant. Notably, he had a
> place on top of the hill where he had a view and his freedom, but
> he was treating the victim as a—as a—his piece of property, which
> he has reiterated in his comments to the Court he viewed this other
> person as being owned by him and not – not able to exercise her
> freedom to choose whether she was with him or someone else. And
> so this is a — a case that involves extreme conduct.

(ECF No. 128 at 19-20) (sentencing transcript). Time has not changed Defendants's extreme views that he was justified in choking, beating, kidnapping, and chaining the victim because she was his property and he believed his actions were necessary to "save" her. See Defendant's Reply in Support (ECF No. 161 at 2-11.) Any reduction of Morgan's life sentence would depreciate the seriousness of his kidnapping offense and fail to protect the public.  Thus, the § 3553 sentencing factors balance heavily in favor of denying Defendant's motion for a reduced sentence.

### B.    Covid-19

Defendant argues that his risk of contracting Covid-19 justifies reducing his sentence to time served. However, the conditions at USP Terra Haute demonstrate that Defendant does not face a high risk of infection at his facility. Risk of infection can be shown by demonstrating the facility where the defendant resides is currently suffering from a COVID-19 outbreak or is at risk of an outbreak. See, e.g., United States v. Terraciano, 492 F. Supp. 3d 1082, 1085–86 (E.D. Cal. 2020). The BOP reports that USP Terra Haute has zero active COVID-19 cases among inmates. See BOP, "Inmate COVID-19 Data," https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#, (last visited March 24, 2025).  Further, almost eighty-seven percent (87%) of inmates at USP Terra Haute are vaccinated. Id. The low rates of transmission suggest that prison conditions at USP Terra Haute do not rise to the level of an extraordinary and compelling circumstance. United States v. Bright, No. 17-cr-0270, 2022 WL 16951832, at *4 (S.D. Cal. Nov. 15, 2022).

Defendant has not identified any health conditions that put him at particular risk were he to contract covid. Further, Defendant has refused to be vaccinated. See, e.g., United States v. Baeza-Vargas, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (an inmate's refusal of a COVID-19 vaccination weighs against a finding of extraordinary and compelling

circumstances") (collecting cases). Accordingly, Defendant has failed to show extraordinary and compelling reasons warranting his release when considering the low infection rates at USP Terra Haute.

### C.    Actual Innocence

Plaintiff argues that the court should consider his actual innocence and his necessity defense as a factor in reducing his sentence. However, these challenges to his underlying conviction are not properly brought in a motion for reduction of sentence under § 3582(c)(1)(A), but instead must be brought through a motion under 18 U.S.C. § 2255. See United States v. Carter, 500 F.3d 486, 490 (6th Cir. 2007) ("[W]hen a motion titled as a § 3582 motion otherwise attacks the petitioner's underlying conviction or sentence, that is an attack on the merits of the case and should be construed as a § 2255 motion."); United States v. Maxwell, 210 F.3d 363 (4th Cir. 2000) (appellant's motion under 18 U.S.C. § 3582 "is more appropriately characterized as a 28 U.S.C.A. § 2255 motion," and is subject to the requirements placed on second or successive § 2255 petitions.

Indeed, a motion under § 2255 is the only avenue through which a federal prisoner can test the legality of his detention. See Stephens v. Herrera, 464 F.3d 895, 897 (9th Cir. 2006) (§ 2255 "is the exclusive means by which a federal prisoner may test the legality of his detention").

Here, Morgan has already filed a 2255 motion (ECF No. 138), which this Court denied (ECF No. 139). Therefore, this motion must be deemed a second or successive § 2255 petition, and this Court cannot exercise jurisdiction over the motion without § 2255(h) certification from the Ninth Circuit. See 28 U.S.C. § 2255(h); see also Rule 9 Governing § 2255 Proceedings for the U.S. Dist. Ct. ("Before presenting a second or successive motion, the moving party must obtain an order from the appropriate court of appeals authorizing the district court to consider the motion, as required by 28 U.S.C. § 2255, para. 8."); Harrison v. Ollison, 519 F.3d 952, 955-56 (9th Cir. 2008). Because Morgan has not received such a certification, the Court will not consider Defendant's argument that he is actually innocent or that his actions had a legal defense.

### D.    Severity of Sentence

Defendant complains that he was sentenced to life imprisonment for a non-homicide

1  crime. However, the sentence considered the violent and serious nature of Defendant's actions

2  and the fact that Defendant accepted no responsibility for his actions. Instead, Defendant

3  continues to justify his actions and assert that he owned the victim and her injuries were

4  essentially self-inflicted since she would not come with Defendant willingly. Defendant is as

5  dangerous today as he was the day he kidnapped the victim. As discussed, the sentence was

6  arrived at after consideration of the sentencing factors and was affirmed by the Ninth Circuit

7  Court of Appeals. United States v. Morgan, 770 Fed. Appx. 389, 391 (9th Cir. 2019) ("this is not

8  one of the rare cases where a sentence is substantively unreasonable").

9          **E.      Summary**

10         Defendant has failed to meet the high burden necessary to show that "extraordinary and

11  compelling reasons" warrant a sentence reduction. Instead, the § 3553 sentencing factors

12  continue to balance heavily in favor of the sentence that Defendant received. Therefore, the

13  Court denies Defendant's motions for compassionate release.

14  **IV.    Conclusion**

15         Accordingly, IT IS HEREBY ORDERED that Defendant's Motions for Compassionate

16  Release Pursuant to 18 U.S.C. § 3582(c) (ECF Nos. 147/167) are **DENIED**;

17         IT IS FURTHER ORDERED that Defendant's Motion for a Status Update (#184) is

18  **DENIED as moot.**

19         DATED: March 24, 2025.

20

21

22         Kent J. Dawson

23         United States District Judge

24

25

26

27

28